# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| UNITED STATES OF AMERICA | * | |
| --- | --- | --- |
| | * | |
| | * | Case No. 13-po-2926 |
| v. | * | |
| | * | |
| MARLO A. BOYD, | * | |
| | * | |
| Defendant | * | |

## MEMORANDUM OPINION AND ORDER OF COURT

This matter is before the Court on Defendant's Motion to Suppress (ECF Nos. 10, 17), to which the Government filed a response (ECF Nos. 12, 14). On December 2, 2013, a hearing was held in which United States Park Police ("USPP") Officer Chris Gogarty and Defendant testified. For the reasons stated below, Defendant's Motion is **DENIED**.

## BACKGROUND

On December 29, 2012, Officer Gogarty was conducting speed enforcement on the Baltimore-Washington Parkway, which is in the special maritime and territorial jurisdiction of the United States, observing northbound traffic at New York Avenue. At about 3:00 a.m., Officer Gogarty observed Defendant's vehicle traveling at 74 miles per hour in a 45-mile-per-hour zone and effected a traffic stop. Officer Gogarty noticed a strong smell of alcohol emanating from the driver's open window. Defendant stated that he had had "a little bit to drink" in response to the officer's inquiry as to how much he had to drink that night. The officer asked Defendant to exit the vehicle in order to perform field sobriety tests. Defendant unsteadily walked to the front of his vehicle, using his right hand on his vehicle to balance himself.

Defendant did not state that he had any medical conditions or injuries. Defendant's eyes were watery and bloodshot, and the officer detected a strong odor of alcohol emanating from Defendant. Officer Gogarty administered the horizontal-gaze nystagmus, walk-and-turn, and one-leg-stand tests. According to the officer, Defendant's performance on the nystagmus test, in addition to his alcoholic odor and admission, indicated that Defendant was under the influence of alcohol. Defendant's performance on the walk-and-turn and one-leg-stand tests also indicated that he was significantly impaired. Officer Gogarty then attempted to administer a roadside breath test on Defendant; however, Defendant "just wasn't following his instructions" and appeared intentionally not to provide a sample. The officer ultimately was able to obtain a partial sample of Defendant's breath. As a result of the breath test, Officer Gogarty handcuffed and arrested Defendant. A second officer arrived, and both officers searched and impounded Defendant's vehicle.

Officer Gogarty transported Defendant to Prince George's Hospital Center for a blood draw because Defendant was "playing games" and "not following his instructions." The officer advised Defendant that "this could go two ways; you can follow my instructions and do a breath test back at the station, or we can go to the hospital to get a blood draw. I'd like to go to the hospital to get a blood draw." According to the officer, Defendant appeared hesitant in responding to whether he desired to go to the station to provide a breath sample, so the officer indicated that they were going to the hospital to obtain a blood sample. Defendant may have either been silent or responded that "that's what we got to do."

On cross-examination, Officer Gogarty conceded that Defendant did not expressly state that he was either consenting or refusing to give blood. The officer also testified that a 36 C.F.R. notice was available at the station, but the officer did not bring Defendant to the station to

provide the written notice before the blood draw.  According to the officer, he explained the provisions of the notice to Defendant on the way to the hospital that a sample would be obtained regardless of Defendant's permission and that the officer had discretion to determine whether Defendant's breath, blood, or urine would be tested.  When Officer Gogarty explained to Defendant that he would have to provide better breath samples at the station, he appeared elusive about whether he would do so.  The officer testified that at no time did Defendant refuse; otherwise, the officer would have charged Defendant with refusal.  Defendant testified, however, that Officer Gogarty neither explained to him the 36 C.F.R. notice nor advised him of his *Miranda* rights.  According to Defendant, he "had no other choice; [he] was under arrest."  At the hospital, Defendant did not resist in providing a blood sample, although he was handcuffed to a chair.  Officer Gogarty then transported Defendant to the police station.

Officer Gogarty testified that he did not obtain a warrant before obtaining Defendant's blood sample because at the time there had been no procedure in place to obtain a warrant in advance of obtaining a blood draw.  The officer theretofore had not sought a warrant before obtaining a blood sample, but he "would have gotten one" if he had been informed that a warrant was necessary.  At that time, however, he would not have known whom to contact for a warrant.  Officer Gogarty testified that, under a procedure beginning in April 2013, in the event an officer needs a warrant for a blood warrant, the officer contacts a sergeant, who then relays the information to the magistrate judge on duty for a telephonic warrant.  According to Officer Gogarty, he has obtained such warrants on two or three occasions.

### **DISCUSSION**

Defendant contends that "[t]he Government has failed to prove that consent or exigency based on the totality of the circumstances in this case allowed for a warrantless blood draw and

3

the court should apply the exclusionary rule" and "suppress the evidence obtained as a result of the unlawful search." (ECF No. 17 at 1.) In response, the Government maintains that (1) the exclusionary rule is not an appropriate remedy in this case because exclusion would serve no purpose; (2) the police reasonably believed that no warrant was required for blood testing when probable cause existed; (3) exigencies in this case made a search warrant impractical and unnecessary; and (4) no procedures for an oral warrant existed in this district. (ECF Nos. 12, 14.) The Court proceeds directly to the issue of the good-faith exception to the exclusionary rule without first considering any underlying constitutional violation. *See United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994) (first turning to consideration of good-faith exception because "a reviewing court may proceed to the good faith exception without first deciding whether the warrant was supported by probable cause" (citing *United States v. Leon*, 468 U.S. 897, 925, 104 S. Ct. 3405, 3421-22 (1984))).

As the Supreme Court has explained, the exclusionary rule is "a prudential doctrine created by this Court to compel respect for the constitutional guaranty. Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search. The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. __, 131 S. Ct. 2419, 2426 (2011) (citations omitted) (internal quotation marks omitted). "Our cases have thus limited the rule's operation to situations in which this purpose is thought most efficaciously served. Where suppression fails to yield appreciable deterrence, exclusion is 'clearly . . . unwarranted.'" *Id.* at 2426-27 (alteration in original) (citation omitted) (internal quotation marks omitted).

"[T]he deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue. When the police exhibit 'deliberate,' 'reckless,' or 'grossly

4

negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* at 2427 (alteration in original) (citation omitted). "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* at 2427-28 (citations omitted) (internal quotation marks omitted).

In *United States v. Lechliter*, No. 8:13-cr-00715-DKC, slip op. at 20-21 (D. Md. Feb. 25, 2014) (Chasanow, C.J.), the district court reversed the undersigned's suppression of the evidence obtained from the defendant's nonconsensual, warrantless blood test after the defendant had been arrested for DUI. The district court held that the undersigned did not address the procedures in place for obtaining a warrant or the availability of a magistrate judge as factors to be considered in analyzing exigency, as required by *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552, 1568 (2013). *Lechliter*, slip op. at 15. The district court further held that the undersigned erred in not applying in that case the good-faith exception to the exclusionary rule. *Id.* at 15-20.

In this regard, the district court determined that *United States v. Reid*, 929 F.2d 990 (4th Cir 1991), was binding precedent at the time of that defendant's arrest. The Fourth Circuit in *Reid* noted that "[s]ociety has a recognized interest in protecting its citizens from drunk drivers. Breathalyzer tests cause a lesser intrusion than blood tests. Time is of the essence when testing for alcohol in the bloodstream." *Reid*, 929 F.2d at 994. "The combination of these factors sets out exigent circumstances which are sufficient to require that the police be allowed to test drunk drivers without first having to obtain a warrant." *Id.* The court in *Reid* held that the availability of a telephonic warrant under then-Fed. R. Crim. P. 41(c)(2) did "not alter the exigency of the situation" because "[o]bviously, compliance with these rules takes time. Time is what is lacking

in these circumstances[.]" *Id.* at 993. The court in *Reid* thus "determined that requiring an officer to obtain a warrant, even *via* the telephonic procedure set forth in then-Rule 41(c)(2), would result in the loss of critical time and, consequently, the loss of key evidence." *Lechliter*, slip op. at 18. The arresting officer in *Lechliter* accordingly "could rely on this binding precedent that the availability of a telephonic procedure did not, by itself, overcome the exigency of the circumstances." *Id.*

The district court in *Lechliter* recognized that *Reid* involved a breath test, not a blood test, but noted that other courts had interpreted *Reid* more generally before *McNeely* to conclude that the naturally rapid dissipation of alcohol in the bloodstream creates an emergency or exigency that justifies a warrantless blood draw. *Lechliter*, slip op. at 18-19 (citing, *inter alia*, *United States v. Sauls*, 981 F. Supp. 909, 913 (D. Md. 1997)). The district court in *Lechliter* ultimately found that "there can be little doubt that the United States Park Police, the United States Attorney's Office, and likely the court itself reasonably believed this was the state of the law in this jurisdiction at the time of [the defendant's] arrest," *id.* at 19, which appears to be true in this case. Here, Officer Gogarty testified that he did not obtain a warrant before obtaining Defendant's blood sample because at the time there had been no procedure in place to obtain a warrant in advance of obtaining a blood draw. The officer also testified that he would have sought a warrant if he had believed that one was necessary. Moreover, in *United States v. Brown*, 13-po-01557, 2013 WL 5604589, at *3 (D. Md. Oct. 11, 2013), a USPP detective testified before the undersigned that, in 2012, "the procedure developed between the U.S. Park Police and United States Attorney's Office in regard to obtaining a search and seizure warrant during non-business hours . . . could take from five to nine hours." Further, it was not the policy of the USPP at that time to obtain a warrant before the nonconsensual taking of a DWI suspect's

blood.  *Brown*, 2013 WL 5604589, at *3.  A USPP officer also testified that she did not attempt to obtain a warrant before taking the defendant to the hospital for a blood draw because she did not believe that she was legally required to do so, she had never obtained a warrant in the past under those circumstances, and she followed the standard procedure in that case.  *Id.* at *2.  In *Lechliter*, the arresting officer testified that he did not obtain a warrant for a blood draw because he was not aware of a requirement or procedure to do so and because he had never sought previously a warrant for a blood test.  *Lechliter*, slip op. at 5.  Thus, as *Lechliter* points out, "in this district, the court, prosecutors, and police were all operating under the belief [in 2012] that a warrant was not necessary to obtain a nonconsensual blood draw where there was probable cause for DWI.  That belief, moreover, was reasonably inferred from" *Reid*.  *Id.* at 13 n.3.

In light of the foregoing, the Court finds that, in obtaining the warrantless blood draw from Defendant, Officer Gogarty reasonably relied on binding precedent at the time of the arrest as set forth in *Reid* and that exclusion in this case would have no deterrent effect.  In light of this ruling, the Court need not resolve the factual issues of whether Defendant consented to the blood test or whether exigent circumstances existed.  Accordingly, Defendant's Motion to Suppress is **DENIED**.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Suppress (ECF No. 10) is **DENIED**.

Date: February 27, 2014                           /s/
                                                  Thomas M. DiGirolamo
                                                  United States Magistrate Judge